# CIRCUIT COURT U.S.

## NEW YORK, SEPTEMBER, 1823.

United States
vs.          } PIRACY.
Joseph Perez.

Messrs. *Tillotson* and *Haines*, counsel for the People.
Messrs. *Hoffman* and *Nevin*, counsel for the Prisoner.

In calling the jury the panel was exhausted, and Dr. Roosa was selected as a talisman. He was objected to by the counsel for the prisoner, that he was a physician. The court overruled the objection, and a peremptory challenge was made.

It was permitted by the court, that the counsel for the prisoner might interrogate the jurors as they came to the book to be sworn, " whether they had expressed an opinion against the prisoner," and they were so interrogated.

Captain Edward Johnson testified, that he was a citizen of the United States, sole owner of the schooner Bee, and principal owner of her cargo. He sailed with her from Charleston, S. C., on the 20th of July, 1822, on a voyage to St. Juan de Remedios, in the island of Cuba. The vessel was of about 50 tons, and the cargo consisted of flour, rice, butter, lard, codfish, tin ware, watches, &c. On the 14th of August, being then about a mile and a half from the coast of Cuba, and not far

from the place of destination, saw a small schooner of about 30 tons coming out from under the land. She was Baltimore built, schooner rigged, apparently about 30 tons burthen, without a topsail, and hoisted Buenos Ayrean colors. She hailed the Bee, on which the anchor was let go, and a boat sent from the Bee on board of her. When the boat returned, witness was forward stooping down and paying out the cable: his first notice that the pirates were on board was their cutlasses, with which they began beating him with great violence. He had with him on board the Bee a sailing-master, whose name was Manuel Fernandez, a Portuguese, who spoke Spanish, James Debau, Joseph Porter, James Thompson, and a Portuguese passenger, who was taken in at Charleston, who spoke no English, and whose name the witness never knew. Fernandez interceded with the pirates, upon which they desisted from beating the witness. They then put a six pounder, which was on board the Bee, into the boat, together with colors, trumpets, and other light articles, and got the Bee under weigh, again running in till within half a mile of land, when they brought her to anchor, and laid the piratical schooner on the larboard side, close to her. At this time there were about twenty of them on board. They took off the tarpaulin, and one of them, who, according to the best of witness' knowledge and belief, was Joseph Perez, the prisoner, took a crowbar and drove it in once or twice into the hatch. They called for the axe of the cook, but before any thing further was done, witness was hurried on board the piratical schooner to assist in throwing out the ballast, for the purpose of lighting her so as to receive the cargo of the Bee. The witness then stated various acts of wantonness and cruelty during eight days, that were

N'W YORK,
Sept. 1823.

The U. States
v.
Perez.

inflicted on them by the pirates; the manner in which they sold off the greater part of the cargo to the people who flocked down from the country to purchase, and the arrival of a British schooner from New Providence, to whom the residue of the cargo was sold.

On the 22d of August, having disposed of all the cargo, the pirates got both schooners under weigh, and beat out to the entrance of the Keys, five or six miles from the main land, when witness was told by the carpenter that they were about to run the Bee ashore. This was soon after done, after taking two or three stretches upon West Salt Key. A small boat like a canoe was brought alongside, with one sail, and one oar and a half, some beef and water. They then ordered witness into the boat; he went in: they then ordered him out again, and he came out. On this the prisoner, Perez, came up to him, and ordered him to take down his small clothes; prisoner then examined the waistband and lining, searched witness' person for belts, and ripped open the lining of his hat and shoes, searching for money. Shortly afterwards the prisoner came up from below, and brought up a gold piece in his hand; he held it up towards witness' face, and said, "dis for you," meaning, as witness supposed, have you any more like this on board? Witness answered him, "No gold in America;" when the prize master, who could speak English, said, "No, no—no gold in America." Witness was now standing by the gunwale, when, turning round, he saw the prisoner take a long knife from his side, and cut the standing part of the fore-peak haulyards, for the purpose, as witness then thought, and still believes, of hanging the cook therewith. Prisoner called the cook, and made

a grasp at him, when the prize master called out, " No, no !" and then he desisted: They ordered witness, the passenger, and all the crew, except Debau, into the boat: there were five in the boat; Capt. Fernandez said they must not stand in shore, or the pirates would kill them all. They accordingly continued. to stand out, till they ran down the hull of the piratical schooner ; they soon after saw the Bee in a blaze. · They then made for the land, (as the boat leaked exceedingly, and had to be bailed constantly by two men,) and got into the mouth of a creek near Matanzas, after being about four days at sea, and landed at Matanzas on the 27th, in the evening.

N'W YORK, Sept. 1823.

The U. States
v.
Perez.

These facts being proved to the court and jury, no doubt existed that they amounted to piracy. Witnesses, however, were introduced who testified to facts that left some doubt whether the prisoner was the same person who committed the piracy upon Captain Johnson.

The case was summed up to the jury by Messrs. Nevins and Hoffman for the prisoner, and by Messrs. Haines and Tillotson for the United States.*

The court charged the jury about eight o'clock in the evening : they retired to consider upon their verdict, and returned into court before ten the same evening, when some points of law were explained to them, and they were again sent out, and about twelve o'clock they were discharged; they having previously informed the

---

* It is impossible in a work of this kind to insert the very able and eloquent addresses of the counsel ; it would swell the work far beyond the limits laid down by the proprietors.

court that they were equally divided, and that there was
no prospect of their ever agreeing upon their verdict.

The U. States
v.
Perez.

A motion was made to discharge the prisoner, by his
counsel, on the ground that the court had no authority to
discharge the jury but in extreme cases, and that this was
not such a case.

The court were divided. Van Ness was of opinion
the jury were discharged too soon. Justice Thompson
decided upon the motion, that there need not be a physi-
cal impossibility to a unity of opinion. He decided, the
court had power to discharge the jury in criminal cases,
and that it rested in the sound discretion of the court, un-
der all the circumstances of the case; that it was not
necessary the jury should be so far exhausted as to be in-
capable of further discussion and deliberation, nor was it
necessary that they should be disabled by sickness, intox-
ication, or mental derangement; it was enough that they
could not agree—that there was a *moral* disability. In
this case, the jury had been out near four hours; a length
of time amply sufficient to agree upon their verdict, if they
could. This was a plain question of fact for them to de-
cide. There were no intricate questions of law in the
case; a longer time ought to be afforded to the jury, where
a case involved a great number of facts and points of law.
It depended more upon the nature of the case, than upon
any settled rule that could be laid down, for the discharge
of the jury. If the jury could not make up their minds
and agree upon their verdict in four hours, where the
identity of the prisoner was the only question before them,
it was probable they never could agree.

As the court were divided, no judgment was given.

The authori-
ties are all col-
lected in Crim.
L. C. vol. 1, p.
475, 476.

The case will be argued at Washington, and the point settled by the Supreme Court.*

* Circuit Court of the U. States.   Philadelphia, October, 1823. *Joseph Haskill* and *Charles Franshaw* were indicted for a piracy committed on board the schooner Tattler, on the 15th of September, 1823.   The evidence, both on the part of the United States and for the prisoners, having been heard, the counsel summed up, and the jury were charged.

At eight o'clock the same evening the jury returned a verdict of guilty on the first count.   Before the verdict was recorded, the counsel for the prisoners expressed an apprehension that one point in the charge of the court had been misunderstood by the jury; and entered into an explanation, which was objected to by the district attorney, but allowed by the court.   One of the jurors then expressed his dissent from the verdict which had been given, believing, as he said, that the prisoners' conduct had arisen from fear.   The court remanded the jury, and adjourned until the following morning.   At 11 o'clock the next morning the jury again came in, and again delivered a verdict of guilty.

The counsel for the prisoner, having heard that one of the jurors had become insane since the last adjournment, required that the jury be polled; upon which the individual alluded to exhibited, by his answer, such decided proof of mental derangement, that the court refused to record the verdict.   The district attorney now suggested that the insanity of the juror had probably arisen from want of food, and that if refreshment were allowed he might recover sufficiently to perform his duty.   But the counsel for the prisoners did not feel themselves at liberty to agree to this proposal, declaring their determination to leave the responsibility of whatever might be done entirely with the court.   The district attorney then offered to discharge the jury by agreement; but this also was declined.   The jury was then remanded until the court should determine on the most advisable course.

It would seem, also, that the juror who dissented on the evening before, had not altered his opinion, but had been induced to agree to the verdict of guilty, under the impression that a written statement of his views, which he had prepared, might be permitted to accompany it.